Argued May 28, affirmed July 9, 1918.

# AKIN v. BATES.

(173 Pac. 889.)

**Trusts—Transfer of Interest in Corporation—Evidence.**

1.   Plaintiff's allegations that he transferred corporation stock and plant, in consideration of its being financed and made to pay, and that a subsequent sale of the plant by a corporation organized to take over the business merely operates as a transfer in trust of the plaintiff's interest, *held* not supported by the evidence.

**Corporations—Conveyance by Corporation—Estoppel of Officer.**

2.   A stockholder and officer, present at the meeting authorizing a transfer of the corporation plant, and later a party to the deed of transfer, and who becomes a stockholder in a corporation organized to carry on the business, and who fails to question the transaction for seven years, is equitably estopped from impeaching the sale.

[As to who may object to sale of property by corporation as *ultra vires*, see note in Ann. Cas. 1916A, 839.]

From Multnomah: CALVIN U. GANTENBEIN, Judge.

Department 1.

This is a suit brought by the appellant on behalf of himself and Diamond Vitrified Brick Company against the defendants for an accounting. The complaint sets forth that he was, on January 18, 1899, the owner and in possession of a brick and tile plant at Russell in the State of Washington; that George W. Bates, now deceased, Sidney Smyth, Harry Howard, Edward G. Crawford, A. W. Ocobock and plaintiff, organized the defendant Diamond Vitrified Brick Company with a capital stock of $25,000; that George W. Bates received 62½ shares, Harry Howard 31¼ shares, Sidney Smyth 31¼ shares, F. S. Akin 117 shares, Edward G. Crawford 3 shares and A. W. Ocobock 5 shares in said company; that a stockholders' meeting was held and Bates was elected president and Akin vice-president of said company; that on April 27, 1899, plaintiff sold and delivered to the Diamond Vitrified Brick Company his

brick and tile plant, including lands, tools, machinery, stock on hand and goodwill, and that the plant was valued at such sale at the sum of $25,000, a price much less than its real value, and that plaintiff accepted 117 shares for his said plant; that Bates, Howard and Smyth paid no other or further sum than $3,000 for their shares; that Bates, Howard and Smyth had the entire management of the plant and that the products of the plant between the eighteenth day of January, 1899, and the twenty-sixth day of August, 1902, were $35,000; that Bates fraudulently represented and stated to the plaintiff that the debts of the prior company necessitated and required that the property be sold to pay the same and that appellant relied on said statements, and that the same were not true; that on or about August 26, 1902, an attempted sale was made of the plant to Bates, who was then the president of the company, in trust upon the understanding and agreement that Bates was to hold the plant in trust to be sold or operated by Bates in his discretion and the debts of the prior company be paid from the operation of the plant or from the proceeds of any sale thereof, and that the balance, if any, was to be returned to the Diamond Vitrified Brick Company to be distributed among the shareholders of said company; that Bates, on August 26, 1902, took possession of the plant, which was of the value of $60,000 on said date, and that he, together with other persons, organized the Diamond Brick Company and that he proceeded to operate the plant through and by means of said Diamond Brick Company; that Bates never assigned or transferred to the Diamond Brick Company any of the assets of the Diamond Vitrified Brick Company, but continued to retain the assets of said Diamond Vitrified Brick Company in his own name; that the Diamond Brick Company was

merely a device used by Bates to cover his operations
of the plant of the plaintiff; that the plant and
its operations and the proceeds thereof were at
all times under the direction and control of Bates;
that a profit was realized from the operation of the
plant above all expenses and debts in the sum of
$75,000, and that sum was the property of the stock-
holders of the Diamond Vitrified Brick Company; that
on or about the eleventh day of December, 1911, Bates
through his control of the stock of the Diamond Brick
Company, sold and disposed of all of the assets of the
Diamond Vitrified Brick Company for the sum of
$200,000 to the Columbia Clay Company, and that de-
fendant Bates was paid in cash, notes, bonds and secu-
rities said sum and that he held the same in trust for
the stockholders of the Diamond Vitrified Brick Com-
pany; that appellant as soon as he discovered the sale
to the Columbia Clay Company, demanded from Bates
that he account to the Diamond Vitrified Brick Com-
pany for the profits received from the operation of the
plant, and that he account for the proceeds of the sale
thereof; that Bates refused to account and refused to
pay plaintiff anything for his property; that the offi-
cers of the Diamond Vitrified Brick Company and of
the Diamond Brick Company were at all times under
the control and domination of Bates, and that said offi-
cers of the Diamond Vitrified Brick Company would
not consent to an action or suit to compel Bates to ac-
count to the Diamond Vitrified Brick Company, or to
the plaintiff, or to anyone, for the property he received
from it or for the profits from the use of the plant
thereof, and that it was necessary that plaintiff be al-
lowed to maintain this suit in order to conserve and
protect the Diamond Vitrified Brick Company and its
stockholders; that the entire management and control

of the operations of the Diamond Vitrified Brick Company and its plant and property was in said Bates, and that the appellant had no plain, speedy or adequate remedy at law; that the appellant offered to do in equity all things on his part, and do and perform such acts as the court may direct him in order to render complete equity between all the parties.

Answers were filed by the defendants and a third amended answer consisted of denials and also certain further defenses to the effect that the appellant was in the control of said Diamond Vitrified Brick Company, and that a certain contract was entered into between the appellant and Bates, Howard and Smyth in regard to the organization of the Diamond Vitrified Brick Company and the purchase of appellant's plant. Certain allegations were made in the answer in regard to the incorporation of the Diamond Brick Company and the taking of stock therein by the appellant, together with an admission that the plant was sold to the Columbia Clay Company for $107,500. In a second further separate answer the defendants allege in substance an acquiescence and estoppel against the plaintiffs.

A reply was filed denying the new matter alleged in the answer and alleging that Bates falsely and fraudulently represented and stated to the appellant that it was necessary to organize the Diamond Brick Company in order to perfect the trust agreement in regard to the transfer of the assets of the Diamond Vitrified Brick Company to him and to carry on and operate the business and that appellant relied upon said statements and did not know to the contrary, and consented and signed the note and agreement set forth in the answer and not otherwise; that appellant never took any part in the proceedings of the Diamond Brick Com-

pany, and that he was not notified of any actions or proceedings to sell the Diamond Brick Company's plant.

Based upon the foregoing there were findings and a decree for defendants, and plaintiff appeals.

AFFIRMED.

For appellant there was a brief over the names of *Messrs. Malarkey, Seabrook & Dibble* and *Mr. William C. Benbow,* with an oral argument by *Mr. E. B. Seabrook.*

For respondents there was a brief over the names of *Messrs. Giltner & Sewall* and *Mr. Guy C. H. Corliss,* with oral arguments by *Mr. R. R. Giltner* and *Mr. Corliss.*

McBRIDE, C. J.—There is no substantial dispute in this case as to the principles of law that should be applied as they are fundamental. The decision, therefore, rests upon a consideration of the facts as disclosed by the testimony which, in this case, is very voluminous and its examination has consumed much time and labor. At the conclusion of the examination we find the facts to be as follows: In 1895 the Oregon Brick Paving Company was the owner of a brickyard and plant situated near the City of Vancouver in the State of Washington; the company became insolvent and passed into the hands of a receiver and in the year last mentioned plaintiff purchased it, paying therefor the sum of $7,176. He then organized a corporation known as the Jensen Paving Company, which operated the plant without success until about the time of the transfer hereinafter alluded to, when through Sidney Smyth and Harry Howard, composing a firm of

paving contractors under the firm name of Smyth & Howard, he was put into communication with George W. Bates, now deceased, and originally the principal defendant in this suit. Bates was the head of the banking firm of George W. Bates and Company and apparently without knowledge or experience in the manufacture of brick and its kindred products. The business of the Jensen Paving Company had proved a financial failure and it was represented by plaintiff to Smyth & Howard that if someone could be found who would put $3,000 into the business, it could be made a success. The result of the conversation between plaintiff and Smyth & Howard was that the two latter interested Bates in the matter and through their representations and those of plaintiff, Bates was induced to contribute $1,500 of the required $3,000, Smyth and Howard contributing $750 each in consideration of which advance the plaintiff sold to them a one-half interest in the Jensen Paving Company. The transfer was made by means of a written agreement which provided that Akin should convey a one-fourth interest in the property owned by the Jensen Paving Company to George W. Bates, and a one-eighth interest to Sidney Smyth and Harry Howard respectively; that a new company should be incorporated under the laws of the State of Washington, with a capital stock of $25,000 to be divided into 250 shares of the par value of $100 each, said corporation to be known as the Diamond Vitrified Brick Company; that Akin should subscribe or cause to be subscribed 125 shares; Bates 62½ shares, Smyth 31¼ shares, and Howard 31¼ shares, and that each of the parties should pay for the stock subscribed by him by conveying or causing to be conveyed to the proposed corporation his interest in the land and plant of the Jensen Paving Company, the whole value of the

land and plant being fixed at $25,000. It was further agreed that Bates should pay into the treasury of the corporation $1,500, and Smyth and Howard $750 each, said fund to be used for operating expenses. The corporation was organized as agreed upon and the $3,000 paid in by Bates, Howard and Smyth, and the Jensen Paving Company lands and plant were duly conveyed to it.

The officers of the Diamond Vitrified Brick Company were George W. Bates president, F. S. Akin vice-president, A. P. Tifft, plaintiff's son-in-law, treasurer, and Sidney Smyth, secretary. Howard was chosen manager but was absent a great portion of the time, therefore plaintiff was to a great extent the actual manager as well as bookkeeper, and either by bad management or from other causes the concern ran behind and contracted an indebtedness of $20,700. Finding it impossible to run the works without loss the plant was closed down. Most of this indebtedness was due the banking firm of George W. Bates & Company and was secured by notes of the Diamond Vitrified Brick Company, which notes were indorsed by Akin, Bates, Smyth and Howard. Bates declined to finance the company further as there appeared little hope at that time that the enterprise would prove a success, as the clay was not of a quality to ensure the successful manufacture of brick. The real moneyed man of the group interested seems to have been George W. Bates, and it is apparent that if the company had been pressed for payment of its indebtedness he would probably have been the principal loser. An attempt was made to increase the capital stock and to put the corporation on its feet again by stock sales, but nobody was found who was willing either to buy the stock or the property, the sale of which plaintiff vainly tried to negotiate. In

view of the critical condition of the company's financial affairs a stockholders' meeting was held on August 26, 1902, at which more than three-fourths of the stockholders as shown by the stock books were present, the only absent stockholders being persons, the beneficial title to whose stock was actually in plaintiff. The minutes of the meeting show, among other things, the following:

"The object of the meeting being to discuss and devise ways and means for paying and providing for the company's indebtedness. It appearing that the company's income is insufficient to pay the interest on the company's debt and anything on the principal of the debt.

"That the company's debt is increasing rather than diminishing, and that the debts of the company are past due and pressing.

"After general discussion, indulged in by all the stockholders, upon motion duly made and carried, the directors of the company were ordered and instructed to transfer and deed the company's real estate and plant and brick on the yard to Geo. W. Bates, he agreeing to assume and pay all the company's debts in consideration therefor.

"No further business appearing, upon motion the special meeting of the stockholders adjourned."

The following also appears:

"Vancouver, Wash., Aug. 26, 1902.

"The stockholders of the Diamond Brick Company hereby authorize and instruct the directors of the company by their proper officers, to transfer the company's real estate, plant and all other assets to George W. Bates in payment of all the company's debts amounting in round numbers to $20,000.00, the said debts being all past due and the company being without funds to pay its said debts and current expenses."

Which was signed by all the stockholders present either in person or by proxy, including plaintiff.

Thereafter an absolute deed of all the property was made to Bates, which was signed by Akin as vice-president.

Thereafter Bates proceeded to organize a new company called the Diamond Brick Company to operate the plant. It was capitalized at $25,000 which was paid for by Bates selling the plant conveyed to him by the former company to the new company. Fifty shares in the new company were allotted to Akin in consideration of his agreement to pay one fifth of the debts paid by Bates on account of the debts of the old company. These shares were subscribed for by him and paid for by giving his note for $4,150 to George W. Bates & Co., payable in one year with 7 per cent interest and at the same time transferring to George W. Bates & Co. the 45 shares of stock as collateral security for the payment of the note, with authority to sell said collateral at public or private sale in case the note was not paid at maturity. Plaintiff was one of the directors of the new company and attended the first directors' meeting, participated in the adoption of the by-laws of the company, and also attended the stockholders' meeting on September 5, 1903. The new concern did not meet with any better success than the previous one. Plaintiff failed to pay his note given for stock subscription or to answer any letters requesting payment, and finally on March 24, 1908, the stock which he had deposited as collateral was actually sold. If the proceedings with respect to the sale from the Diamond Vitrified Brick Company to Bates, were regular and in good faith, what they appear to be on their face, plaintiff ceased to have any further interest in the company or in the property which he had transferred to the Diamond Vitrified Brick Company, and he was in fact entirely silent as to any claim to the

property or the stock of any of the corporations which had operated the plant until 1912, when he learned that Bates had sold the property. The contentions of plaintiff are these:

"That in the beginning Bates agreed with plaintiff in consideration of a transfer to him, Smyth and Howard of a one-half interest in plaintiff's plant, that he would, if given control, finance it and put it on a paying basis. That Bates did finally put it on a paying basis and has sold the entire plant and should now account for the profits for the use of Akin's share and for the proceeds of the sale thereof.

"That the attempted transfer to Bates of the property of the Diamond Vitrified Brick Company was void and only amounted to a transfer in trust so far as Akin's interest therein is concerned.

"That, if the 45 shares of stock issued to Akin be held to have been legally issued, then, they were converted by Bates and his banking-house and he and the bank should account therefor."

Not one of these contentions is supported by the preponderance of evidence, but each rests substantially upon the uncorroborated statements of plaintiff.

1. Plaintiff's testimony as to the first proposition is flatly contradicted by Bates, Smyth and Howard, the two latter having no present interest in the result of the controversy. Bates was a man of business experience and financial sagacity and it is almost inconceivable that he would embark on a business enterprise concerning the practical workings of which he knew nothing, and absolutely bind himself to make it a financial success. Plaintiff's testimony is also contradicted by the written agreement of the parties which indicates that the consideration for the transfer was the sum of $3,000 to be paid into the treasury of the proposed new company by Bates, Smyth and Howard. It is idle

to discuss the amounts paid for the property by Akin or the value of the plant or the amounts fruitlessly expended in the endeavors to make the business a success. The fact is potent that the enterprise was a failure and that Akin was at the end of his tether, and he was compelled either to get somebody associated with him who might make it a paying venture or lose everything. Smyth and Howard were contractors engaged in street paving, and plaintiff no doubt built largely upon a prospect that they would be able to obtain contracts, whereby they could use large quantities of the vitrified brick which he hoped his plant would be able to produce. He thought he knew the capabilities of his plant and that with the help of these contractors and the ready money which they had agreed to put into the business he could retrieve his fortunes and by so disposing of a one-half interest in a losing concern, make the other half a dividend payer. That his hopes resulted in failure; that the clay would not produce vitrified brick in sufficient quantities or of the required quality to fulfill his expectations, was neither his fault or that of Bates, Smyth or Howard, but arose from conditions over which none of the parties had any control.

2. The second contention is directly in the teeth of the pleadings, which assume a valid transfer of the stock of the Diamond Vitrified Brick Company to Bates, but claim that it was in trust and to be held by him as security for the payment of debts of the company and to be reassigned to the stockholders when such debts were paid. Plaintiff is therefore confined to this issue and it is needless to discuss the legality of the proceedings by which the transfer was authorized, although it may be remarked in passing that plaintiff as a stockholder and officer of the company was pres-

ent at the stockholders' meeting where the transfer
was authorized and consented thereto, and subse-
quently upon Bates assuming and paying the debts of
the Diamond Vitrified Brick Company, signed as vice-
president of the company a deed conveying to Bates
absolutely the property of the company.   Under these
conditions, even if the pleadings are disregarded, Akin
is in no position to say that the sale was not properly
authorized.   But upon the issue tendered by the plead-
ings, plaintiff is contradicted by the testimony of four
witnesses, Bates, Smyth, Howard and Tifft, as well as
by the fact that he became a member of the new corpo-
ration which Bates projected, the Diamond Brick Com-
pany, subscribed for 45 shares of its stock, gave his
note for $4,150 secured by the deposit of the shares
as collateral security in payment of the shares, and
subsequently upon default of payment allowed the
shares to be sold without protest and the proceeds of
the sale to be applied upon the indebtedness evidenced
by the note.   We think the testimony indicates that
plaintiff was more familiar with the business of the
Diamond Vitrified Brick Company than any other per-
son connected with it, and that he consented to these
transfers knowing just what he was doing, and that
they are fair and untainted by fraud.   It is true that
after plaintiff had lost his interest in the property
Bates, by the lucky discovery of the fact that by the
addition of Rosland shale to the clay and by the in-
vestment of large sums of money in additions and im-
provements, was enabled to make the plant pay a profit
and thereby sell it for a considerable sum, but this
gives plaintiff no legal right to participate in the
profits which would have inured to him if he had paid
for his stock according to the terms of the note which
he executed when he subscribed for it.

It is worthy of note that no officer or stockholder of
the Diamond Vitrified Brick Company has partici-
pated in plaintiff's attempt to impeach the sale to
Bates. If there is any recovery here it is for Akin's
sole benefit. The other stockholders have pocketed
their losses and do not complain. Ever since 1908,
when plaintiff's 45 shares of stock in the Diamond
Brick Paving Company were sold, he has stood by
without protest and allowed Bates to invest large sums
of money in bettering the property upon the theory
that it was his own and no doubt believing that it was
his own, and now seeks to impeach the sale upon the
pretext, not charged in the pleadings, that the transfer
was illegal and unauthorized. He has acquiesced in
the transfer by Bates of the whole *corpus* of the prop-
erty to another corporation and has himself been a
stockholder in that corporation and participated in the
stockholders' meetings. It is inconceivable that Bates
would have made the investments that he did, to make
the property profitable, if plaintiff from 1903 to 1910
had asserted the claims he now makes, and informed
Bates that while he (Akin) declined to risk anything
to improve the property even to the extent of paying
for the stock he had subscribed, he expected to partici-
pate in any profits that might ensue if the venture
should prove successful. He is equitably estopped
from impeaching the regularity of the proceedings
leading up to the final conveyance to Bates, both by
having participated in the transfer and by his silence
when he had every reason to believe that Bates was
honestly proceeding upon the theory that the sale had
been properly authorized: 1 Cook on Corporations,
§§ 143, 144; 3 Ibid., 2607, 2609, 2614, 2666.

Some question has been raised as to the regularity
and good faith of the sale of the stock to Ambrose, but

this contention is not sustained by the testimony. To consider the testimony in detail would expand this opinion into a volume. The complaint charges fraudulent representations and concealments by Bates in regard to the condition of the property, but these are not sustained by the testimony. The trial judge, who heard the testimony and saw the witnesses was better able than we to judge of their credibility, was of the opinion that plaintiff had failed to establish his case upon the facts, and in that conclusion we concur and the decree of the Circuit Court is affirmed.

AFFIRMED.

BENSON, BURNETT and HARRIS, JJ., concur.